Filed 3/26/14  P. v. Gallaway CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KENNETH GALLAWAY,<br><br>    Defendant and Appellant. | B249630<br><br>(Los Angeles County<br>Super. Ct. No. BA401512) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Anne H. Egerton, Judge.  Affirmed.

        Suzann E. Papagoda, under appointment by the Court of Appeal, for Defendant and Appellant.

        No appearance for Plaintiff and Respondent.

————————————

Defendant and appellant, Kenneth Gallaway, appeals from the judgment entered following a jury trial which resulted in his conviction of three counts of making criminal threats (Pen. Code, § 422, subd. (a))[1] and one count of inflicting corporal injury on a spouse or cohabitant (§ 273.5, subd. (a)), and his admissions, with regard to all four counts, that he previously had been convicted of assault with a deadly weapon (§ 245, subd. (a)(1)), possession of a controlled substance (Health & Saf. Code, § 11350), and four counts of second degree burglary (§ 459) for which he served prison terms within the meaning of section 667.5, subdivision (b) and one count of assault with a deadly weapon (§ 245, subd. (a)(1)) within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and, with regard to the three counts of making criminal threats (§ 422, subd. (a)), he previously had been convicted of the serious felony of assault with a deadly weapon (§ 245, subd. (a)(1)) within the meaning of section 667, subdivision (a)(1). The trial court sentenced Gallaway to 18 years eight months in state prison. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*.

Deanna Brown and Gallaway had lived together as boyfriend and girlfriend in an apartment near skid row for approximately one and one-half years. However, Gallaway began to have "violent outbursts." He began picking fights and yelling and, on July 30, 2012, he slapped Brown. The following day, after she had received her disability check, Brown gathered some of her clothes and other belongings, including her cell phone, then left the apartment and went to the Barclay Hotel on the corner of 4th and Main Streets and rented an upstairs room.

After she left, Brown began to receive voice mails from Gallaway on her cell phone. Gallaway, in an "angry" and "scary" voice, left "numerous" messages indicating he was going to "hurt [Brown]." Brown was so frightened by the calls she did not leave her room for some time. However, just after midnight on August 7, 2012, Brown decided

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

to walk the approximately six blocks from her hotel to the Midnight Mission to get some cigarettes. As she was walking down Main Street between 5th and 6th Streets, Gallaway "came up behind [her] and hit [her] in the back of [her] head." Brown, who had not seen Gallaway coming, fell to the ground. As she attempted to get up, Gallaway knocked her back down and began to hit and kick her. Although Brown continued to try to get up so that she could run from Gallaway, he kept kicking her, slapping her and even dragged her down the street by her hair. Brown could not remember how many times Gallaway had hit her in the face and kicked her in "the torso and . . . anywhere else he could kick . . . or hit [her]."

While he was hitting and kicking her, Gallaway was yelling at Brown, telling her she should not have left him and she was not "going to get away with leaving him." Gallaway told Brown he was "going to kill [her] because [she had] left him." At that point, Brown started to scream and two men who had been across the street ran over to assist her. Gallaway "took off running" and one of the men ran after him while the other man helped Brown stand up. The man who had run after Gallaway returned to the area and the two men stayed with Brown until she was able to call a friend named James, who told Brown he would come and help her. After making certain James was on his way, the two men "went on their way." James then arrived at 6th and Main Streets with a wheelchair and took Brown to the police station a couple of blocks away, at 6th and Wall Streets.

After James left her at the police station, Brown "hobbled" inside and spoke with a desk officer. The officer took photographs of Brown's injuries, including scrapes on her knees and elbows, bleeding on her right hand, injuries to her face and bruises and marks she had from "being punched and kicked multiple times." In addition, Brown was having problems with her hearing and her jaw on the right side of her head where Gallaway had hit her. During the beating she had nearly passed out several times and felt "lightheaded." After the beating, she began to have nightmares and, at the time of trial, was still suffering from them. Yet, when she spoke with the police officer on the night of

3

August 7, she told him she "did not need any medical treatment." Brown told the officer she "just wanted to lay down and quit being scared."

At the station, Brown informed the police officers she had voice mails from Gallaway. An officer had her play the messages for him while he recorded them, then took Brown's statement. During her statement, Brown told the officer Gallaway had said, " 'You should have never left me,' " and " 'I'm going to kill you.' " Brown did not, however, at that time give to the officer Gallaway's address. She went back to the police station the following day, telephoned the detective's division and gave to them the address of the apartment where she and Gallaway had lived.

Almost immediately after the attack and for several days thereafter, Brown received additional voice mails from Gallaway. During the first calls, Gallaway did not say anything. "There [were] calls and hangups, breathing and stuff like that, but . . . no message." Then Gallaway began to threaten Brown, which put her in "fear for [her] life." He stated he was going to "sick a dog on [her]," referred to her as a "bitch" and told her that he was "gonna get [her]" and "catch [her] bitch ass." Brown interpreted the messages to mean her relationship with Gallaway "wasn't over" and he was "going to hurt [her] again if he could."

At the time of trial, Brown indicated her friend James was "centrally located," but no longer had a phone and she did not know where he was or how to locate him. As to the two men who had come to her aid on the night of August 7, Brown did not know how to find them.

Brown admitted having been convicted of misdemeanor prostitution in July 2010 and February 2006.

After she initially reported the attack by Gallaway, Brown was referred to Detective Joshua Riggs. The detective worked on "major assault crimes," including those involving "domestic violence." Riggs was assigned to the central division which is located at 6th and Wall Streets. Riggs first met with Brown on the morning of August 15, 2012.

4

When Brown first told Riggs about the night she was attacked, she also told the detective she had voice mail messages from Gallaway from both before and after the August 7 incident. Riggs had Brown play the messages for him and he recorded them. While Riggs was recording the messages, Brown became "very scared" and began to cry. It appeared to Riggs that "[Brown] feared for her life."

Brown told Riggs where Gallaway was likely still living and Riggs had undercover officers go to the address and take him into custody. After Gallaway was transported to the central division station, Riggs interviewed him. The interview was "video-recorded."[2] The recording indicates, after Riggs advised Gallaway of his *Miranda*[3] rights, Gallaway agreed to speak with the detective. When Riggs then showed Gallaway a photograph of Brown as she appeared after the attack on August 7, Gallaway indicated he "didn't do that to her." Gallaway stated Brown had "r[u]n out." She had run away from their apartment without paying the cable bill or the rent. Gallaway told Riggs Brown had left on August 1 and he had seen her only once since then, on a morning during the week before he had been taken into custody. When he saw her, Brown had attempted to hide from Gallaway.

When asked about the August 7 beating, Gallaway denied having anything to do with it. He indicated "[a]nybody could have [done] that to her." Gallaway told the detective there were "gang[s] of people . . . looking for [Brown]" because she owed them money. After Gallaway again denied beating Brown, he admitted leaving messages on her phone. He stated, in leaving the messages, he was "trying to tell [Brown] . . . 'you can come home no matter what you did, you can come home [and] we can fix this.'" Gallaway then indicated he had said some things "out of anger" and had called Brown a name. Gallaway stated that when he told Brown he "got her, [he]wasn't talking about

---

**2**    The recording was played for the jury and each juror was provided with an accompanying transcript of the interview. The transcripts, however, were not admitted into evidence.

**3**    *Miranda v. Arizona* (1966) 384 U.S. 436.

5

killing her, [he] never said nothing about killing her or anything like that." In addition, Gallaway indicated some of the messages he left were "just out of frustration."

During the interview, Riggs told Gallaway, after Gallaway had left "a bunch of threatening messages, [Brown] got hurt and right after she [got] hurt [Gallaway had left] messages [stating] 'I wasn't trying to hurt you.' " Riggs then asked Gallaway, "Do you see how that looks?" Gallaway responded, "Yeah I see how it looks . . . [but] [i]t wasn't me." Gallaway continued, "No, that's the God honest truth, . . . man I would never do nothing to a woman like that, period." Riggs then stated, "But the guy on the phone here, that I heard, . . . [s]ounds like [he] would hurt a lady." When Riggs then repeated a statement made by Gallaway to Brown, that " '[it was] gonna catch up with [her] just like tonight,' " Gallaway again denied attempting to hurt Brown, indicated he would "never do this" and stated he did not "know how [it] happened." Gallaway indicated he had been walking down the street earlier that evening, had seen Brown, asked her what was going on, then "just walked away." After again denying he had hurt Brown, Gallaway stated it was his theory someone Brown owed money to "did that to her, then she blamed it on [him]." Gallaway insisted he was not the one who beat Brown on August 7.

After finishing his interview with Gallaway, Riggs placed Gallaway under arrest and booked him. As the investigating officer, Riggs then presented the matter to the District Attorney's Office for filing.

2. *Procedural history.*

In a second amended information filed on January 15, 2013, Gallaway was charged with three counts of section 422, subdivision (a), the felony of making criminal threats (counts 1, 3 and 4), and one count of section 273.5, subdivision (a), the felony of inflicting corporal injury to a spouse or cohabitant (count 2). It was further alleged all four counts were serious or violent felonies and any custody time imposed for them would be served in state prison pursuant to section 1170, subdivision (h)(3). It was also alleged as to all four counts Gallaway had suffered convictions of assault with a deadly weapon (§ 245, subd. (a)(1)), possession of a controlled substance (Health & Saf. Code, § 11350) and four convictions of second degree burglary (§ 459), for each of which he

6

had served a prison term within the meaning of section 667.5, subdivision (b). In addition, it was alleged with regard to all four counts Gallaway had suffered a conviction of assault with a deadly weapon within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). Finally, it was alleged with regard to counts 1, 3 and 4, making criminal threats, that Gallaway had suffered a conviction of the serious felony of assault with a deadly weapon within the meaning of section 667, subdivision (a)(1).

Prior to jury selection, the prosecutor indicated he intended to present a recording of "a *Mirandized* statement . . . taken [from Gallaway] by Detective Riggs." As the early portion of the tape recorded interview dealt with Gallaway's parole status, the trial court agreed that section could be redacted.

With regard to the impeachment of Brown, it was determined she had suffered seven convictions of "prostitution-related conduct." The trial court indicated, as the convictions involved moral turpitude, the issue was whether they were more prejudicial than probative with regard to Brown's credibility. (See Evid. Code, § 352.) After weighing the relevant factors, the trial court determined the prosecutor could impeach Brown with her two most recent convictions.

During trial, when the recording of Detective Riggs's interview with Gallaway was played for the jury, the trial court indicated it would, and later did, give to the jury a limiting instruction indicating, although Gallaway's statements were admissible as admissions (see Evid. Code, § 1220), the statements by the detective were merely "[h]is opinion about what happened or whether a crime had been committed [and were] not relevant." The trial court continued, "[S]o you're not really to give any weight to his questions. His questions are not evidence, except insofar as they may bear on the answers given by Mr. Gallaway."

After hearing all of the evidence, the arguments and instructions, the jury began its deliberations. One juror had made notes on the transcript of the tape recording of Detective Riggs's interview with Gallaway and requested, although the transcripts had not been admitted into evidence, he be allowed to take his copy into the jury room so he

7

could refer to his notes. After discussing the matter with counsel, the trial court determined, as defense counsel had been unable to point to a single error in the transcript and the court had informed the jury the transcript was not to be considered evidence, it would allow the juror to have his copy of the transcript in the jury room during deliberations.

The jury began deliberating at 1:58 p.m. on January 23, 2013. At approximately 3:30 p.m. that same day, the jury informed the trial court it had reached verdicts. The jury found Gallaway guilty of three counts of making criminal threats in violation of section 422, subdivision (a) (counts 1, 3 and 4) and one count of inflicting corporal injury on a spouse or cohabitant in violation of section 273.5, subdivision (a) (count 2). The jury was polled and each juror indicated those were the verdicts he or she had reached.

Although Gallaway had initially requested a court trial on his prior convictions and prison terms, at sentencing proceedings held on May 22, 2013, he waived his right to a court trial and indicated he would admit them. After the trial court admitted into evidence a section 969b packet presented by the People, Gallaway admitted each of the prior convictions and prison terms alleged in the information. Defense counsel joined in the admissions and stipulated to the priors and, based on the stipulation, the trial court found the prior convictions and prison terms true.

Before sentencing, defense counsel made a *Romero*[4] motion requesting the trial court to strike Gallaway's 2002 conviction of assault with a deadly weapon which had been alleged as a Three Strikes prior. In determining whether to grant the motion, the trial court indicated there were "three separate factors for the court to consider. [¶] The first [was] the nature and circumstances of the present offense; the second [was] the nature and circumstances of the defendant's prior offenses or offense, the strike prior; and the third [was] the particulars of the defendant's background, character, and prospects." With regard to the "strike prior," the assault with a deadly weapon, the trial court noted it had involved three victims and Gallaway had been on parole after having served a term in

---

[4]     *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

8

prison for the crime when he committed the present offenses. As to the present offenses, the trial court indicated there were multiple telephone calls alleged with regard to each count of making criminal threats and a "series of acts" involved in the count alleging the infliction of corporal injury on a cohabitant. During the commission of that crime, Gallaway not only attacked Brown from behind, he dragged her by her hair, hit and kicked her. In the trial court's view, it was a "very serious crime." The trial court then indicated, in terms of Gallaway's character and prospects, his first felony conviction had been for a 1991 burglary. Between 1991 and 1998, Gallaway had suffered five additional burglary convictions. In 1999, Gallaway was convicted of a drug-related crime then, in May 2000, he committed the assault with a deadly weapon alleged as a strike. During the assault, Gallaway had used a knife and attacked three separate victims. Gallaway was on parole from his prison term for the assault when he committed the present crimes. The trial court noted that, although there was evidence Gallaway had mental health and substance abuse issues, "all the testimony at trial suggested that he knew perfectly well what was going on" when he committed the present offenses. The court concluded, "for all the reasons . . . stated," it was going to deny Gallaway's *Romero* motion.

After listening to further argument regarding sentencing, the trial court determined, based on the facts presented, there existed aggravating factors but no factors in mitigation. Accordingly, with regard to count 1, making criminal threats, the trial court imposed the upper term of three years in prison, then doubled the term to six years pursuant to the Three Strikes law. For the allegation Gallaway had previously suffered a conviction of the serious felony of assault with a deadly weapon pursuant to section 667, subdivision (a), the court imposed a consecutive term of five years in prison. As to count 2, the infliction of corporal injury on a cohabitant, the court imposed one-third the midterm, or one year, then doubled the sentence to two years pursuant to the Three Strikes law. For counts 3 and 4, each of which alleged the making of a criminal threat, the court sentenced Gallaway to eight months then doubled each term to 16 months, the terms to run consecutively to the time previously imposed. For the three most recent prior prison terms admitted by Gallaway, the court imposed one consecutive year for

9

each term served.  The trial court then dismissed all the remaining counts and allegations pursuant to section 1385.  In total, the trial court sentenced Gallaway to 18 years eight months in state prison.  The court then awarded Gallaway presentence custody credit for 272 days actually served and 272 days of good time/work time, for a total of 544 days.

With regard to fines and fees, the trial court ordered Gallaway to pay a $160 court operations assessment (§ 1465.8, subd. (a)(1)), a $30 criminal conviction assessment (Gov. Code, § 70373), a $240 restitution fine (§ 1202.4, subd. (b)), and a stayed $240 parole revocation restitution fine (§ 1202.45).

Gallaway filed a timely notice of appeal on June 25, 2013.

## CONTENTIONS

After examination of the record, counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record.  By notice filed December 24, 2013, the clerk of this court advised Gallaway to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider.  No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities.  (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.

We concur:


CROSKEY, J.


ALDRICH, J.

11